IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHESTER S. VAUGHN                                              PLAINTIFF

v.                          Civil No. 09-5205

DR. JAMES HUSKINS,
Benton County Detention Center;
NURSE MARSHA SMITH,
Benton County Detention Center;
SGT. FRY, Benton County Detention
Center; CAPTAIN ROBERT HOLLY,
Benton County Detention Center;
and SHERIFF KEITH FERGUSON                                      DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983.

He proceeds *pro se* and *in forma pauperis.*

The events that are the subject of this action occurred while Plaintiff was incarcerated

in the Benton County Detention Center (BCDC) from July 22, 2009, to November 8, 2010.

Plaintiff's claims his constitutional rights were violated when he was denied adequate medical

care following a chemical splash to his left eye.  Plaintiff names as Defendants:  Dr. John

Huskins; Nurse Marsha Smith; Sergeant Fry; Captain Robert Holly; and Sheriff Keith

Ferguson.

A motion for summary judgment has been filed on behalf of Defendants (Docs. 42, 43

& 44).  To assist Plaintiff in responding to the summary judgment motion, a questionnaire was

prepared (Doc. 50).  On August 3, 2011, Plaintiff filed his response to the questionnaire (Doc.

51).  The motion is now ready for decision.

-1-

AO72A
(Rev. 8/82)

### 1.  Background

On July 22, 2009, Plaintiff was booked into the BCDC on a parole violation charge. *Plaintiff's Response* (Doc. 51) at ¶ 1 (hereinafter *Resp.*).  He remained incarcerated there until November 8, 2010.  *Defendants' Exhibit* 1 at pg. 2 (hereinafter *Defts' Ex.)*.   When he was booked in, Plaintiff indicated he was taking a variety of medications as a result of high blood pressure and because of his heart.  *Defendants' Exhibit* 2 at pg. 1 (hereinafter *Defts' Ex.*).  He also indicated he had a bad tooth and pins in his right elbow.  *Id.*

Plaintiff was seen by Dr. Huskins on a number of occasions for a variety of ailments including headaches, nose bleeds, sinus problems, high blood pressure, dry skin,  head and chest colds, rashes, dizziness, and inguinal pain.  *Defts' Ex.* 10 at pgs. 2-6.

On Saturday, September 12th, when Plaintiff was mopping, the cleaning chemical he was using splashed into his left eye.  *Resp.* at ¶ 3.  Plaintiff asked to take a shower to wash the chemical out of his left eye.  *Id.* at ¶ 2(A).  He was denied permission to shower because it was lock-down time.  *Id.* at ¶ 2(B).  Plaintiff states his eye was burning like fire so he went to his cell and tried to get the chemicals out by throwing water in his eye all night.  *Id.* at ¶ 2(C) & pg. 57.  He received no help from jail staff that evening.  *Id.* at ¶ 2(D).

According to Plaintiff, there are no eye wash stations in the jail.  *Resp.* at ¶ 35. However, he was provided with artificial tears that evening.  *Id.*

On September 13th, Plaintiff submitted a medical requesting stating his eye was burning like fire as a result of the chemicals that splashed into it the prior day.  *Defts' Ex.* 3 at pg. 8.  He asked for someone to look at it ASAP.  *Id.*  The jail log indicates Plaintiff was "given eye wash" due to having "chemicals splashed in eyes."  *Id.*

AO72A
(Rev. 8/82)

At this time, Plaintiff states his eye was "raw and red as all get out." *Resp.* at ¶ 39. Sergeant Fry was consulted and he called the nurse. *Id.* The nurse did not come to the jail to examine Plaintiff's eye. *Id.* Plaintiff's request to be taken to the hospital was refused. *Id.*

Plaintiff submitted a grievance on September 14th stating that he had gotten cleaning chemicals in his eye on Saturday and that there was no medical staff at the jail to look at his eye. *Defts' Ex.* 4 at pg. 4. He complained that only jail staff had looked at his eye and that it was now Monday and that he could not see out of his left eye. *Id.*

Dr. Huskins saw Plaintiff for eye irritation on September 14th. *Defts' Ex.* 10 at pg. 4. Dr. Huskins noted that Plaintiff's cornea was clear. *Id.* According to Dr. Huskins, this indicated that there was no inflammatory process going on at that time. *Id.* However, Plaintiff continued to complain of problems so he was sent to the emergency room the following day, September 15th. *Id.*

Plaintiff was taken to the emergency room at Mercy Health and examined by Dr. Clark. *Resp.* at ¶ 7(A). Plaintiff's eye was washed out and a diagnosis of chemical conjunctivitis[1] given. *Id.*; *Defts' Ex.* 6 at pg. 1. Plaintiff was given a prescription for eye drops, sulfacetamide (bleph-10) 10% OP drop, to be administered one drop in each eye every two hours for seven days. *Id.* He was also told to take acetaminophen, 500 mg., one tablet every six hours as needed for pain. *Id.* Plaintiff received the eye drops but not until twenty-four hours later. *Resp.* at ¶ 7(A). Even then, he states jail medical staff changed the dispensing instructions to four times a day instead of every two hours. *Id.* at pg. 51.

---

[1] Conjunctivitis is an inflammation of the transparent mucous membrane that lines the inner surface of the eyelids and covers the white part of the eye. It can be caused by viruses, bacteria, chemical irritants, traditional eye remedies or allergy. The eyes are red and uncomfortable and there is a discharge that may make the eyelids stick together in the morning. http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1705660/ (accessed August 25, 2011).

On September 16th, Plaintiff requested a copy of the material safety data sheet for the cleaning chemical. *Resp.* at ¶ 9(A). His request was refused because he did not state what solution he was using. *Id.* On September 22nd, another request was refused because Plaintiff could not identify the unmarked bottle he used to clean the pod that day. *Id.* at ¶ 14. Requests for this information made on September 25th and October 7th were also denied. *Id.* at ¶ 16(A) & ¶ 21(A). However, Lieutenant Carter did advise Plaintiff that the material safety data sheets were available to the medical staff. *Id.* at ¶ 21(B).

On September 18th, Plaintiff complained of pain in his eye caused by the chemical. *Resp.* at ¶ 10(A). He requested pain medication and was instructed to submit a medical request. *Id.* at ¶ 10(B).

On September 21st, Dr. Huskins rechecked Plaintiff's eye. *Defts' Ex.* 10 at pg. 4. According to Dr. Huskins, Plaintiff's eye looked fine. *Id.* However, Plaintiff was still complaining about problems with his eye and the decision was made to send Plaintiff to see an ophthalmologist at the Boozman Hof Clinic. *Id.* at ¶ 5. Plaintiff disputes that the eye was fine and notes that Dr. Clark had diagnosed Plaintiff as having chemical conjunctivitis. *Resp.* at ¶ 13(C).

On September 23rd, Plaintiff was seen at the Boozman Hof Clinic. *Defts' Ex.*7. He was diagnosed with filamentary keratitis-os[2] and prescribed Azasite for two days and Optive artificial tears. *Resp.* at ¶ 15(B).

---

[2]A condition characterized by the formation of epithelial filaments of varying size and length on the corneal surface. Stedman's Medical Dictionary (27th ed. 2000).

On September 30th, Plaintiff was seen for a follow-up at the Boozman Hof Clinic. *Defts' Ex.* 7 at pg. 3.  He was diagnosed with conjunctivitis-os, keratitis, and nystagmus.[3]  *Id.*  Eye drops were again prescribed.  *Id.*  Plaintiff states it once again took twenty-four hours before he began receiving the drops.  *Id.*

On October 4th, Plaintiff complained he was having "a lot" of pain in his eye which made his head hurt.  *Resp.* at ¶ 19.  As a result, he stated he could not sleep.  *Id.*  Dr. Huskins saw Plaintiff on the 7th and prescribed Aleve for the headache.  *Defts' Ex.* 10 at pg. 5.

Dr. Huskins examined Plaintiff's eye again on October 9th.  *Defts' Ex.* 10 at pg. 5.  He noted the eye exam was unchanged.  *Id.*

Dr. Huskins next saw the Plaintiff on October 12th.  *Defts' Ex.* 10 at pgs. 5-6.  Because Plaintiff was still complaining of symptoms, he was sent back to the ophthalmologist.  *Id.*

Plaintiff was seen at the Boozman Hof Clinic on October 14th.  *Defts' Ex.* 7 at pg. 2.  He was diagnosed with keratitis and nystagmus.  *Id.*  He was prescribed zelex, ibuprofen, and artificial tears.  *Id.*  Plaintiff received the medication but states it was "not working for the pain."  *Resp.* at ¶ 25(D).

On October 24th, Plaintiff complained that the artificial tears burned his eyes.  *Resp.* at ¶ 31.  He asked for something to help with this problem.  *Id.*

On October 26th, Plaintiff was seen by Dr. Huskins for continued eye complaints, a cold, and dry skin on his feet.  *Resp.* at ¶ 32(A).  Dr. Huskins prescribed hydrocortisone cream for Plaintiff's feet, cold medicine, and antibiotics.  *Id.*

---

[3]Nystagmus is defined as the "[i]nvoluntary rhythmic oscillation of the eyeballs, either pendular or with a slow and fast component."  <u>Stedman's Medical Dictionary</u> (27the ed. 2000).

-5-

On October 31st, Plaintiff complained that his eye was burning all the time. *Resp.* at ¶ 33(A). He asked to go to the eye doctor. *Id.* Dr. Huskins checked Plaintiff's eye on November 2nd and saw nothing wrong. *Defts' Ex.* 10 at pg. 6.

According to Dr. Huskins, he never observed any problems with Plaintiff's left eye due to chemicals. *Defts' Ex.* 10 at pg. 7. But because Plaintiff kept complaining of symptoms, Dr. Huskins sent him to the Boozman Hof Clinic on three separate occasions. *Id.* at pgs. 7-8.

Plaintiff maintains he is still having trouble with his left eye. *Resp.* at ¶ 18(B). He states: "It's like looking through a [piece] of plex[i]glass that's smoked." *Id.* He maintains the chemicals damaged his eye and it cannot be fixed. *Id.* at ¶ 22.

Plaintiff was asked to state how each of the Defendants exhibited deliberate indifference to his serious medical needs. With respect to Sheriff Ferguson, Plaintiff maintains he should have kept himself informed about the every day problems in the jail. *Resp.* at ¶ 36. He also maintains Sheriff Ferguson did not properly train his staff in connection with responding to medical emergencies. *Id.* at pg. 55. Plaintiff never spoke to Sheriff Ferguson about his requests for medical care. *Id.* at ¶ 42(C). He does believe he sent Sheriff Ferguson a request for an interview but states he received no response. *Id.*

With respect to Nurse Smith, he states she should have told Sergeant Fry to send Plaintiff to the hospital at once. *Resp.* at ¶ 36. Instead, she merely had Plaintiff placed on the list to see Dr. Huskins resulting in further delay in his receipt of care. *Id.*

With respect to Sergeant Fry, Plaintiff indicates he was the man in charge and should have had Plaintiff taken to the hospital on September 13th. *Resp.* at ¶ 36. With respect to Dr. Huskins, Plaintiff states he initially refused to allow Plaintiff to have an eye examination.

-6-

*Resp.* at ¶ 36.  When he saw Dr. Huskins, Plaintiff states it was only for one or two minutes. *Id.*  Plaintiff believes Dr. Huskins tried not to spend any money. *Id.*  Plaintiff also points out that Nurse Smith and Dr. Huskins overrode Dr. Clark's prescription that required the administration of drops every two hours. *Id.* at pg. 51.

Finally, with respect to Captain Holly, Plaintiff states he "flat out" refused to help him get the material safety data sheets on the chemical involved. *Id.*  Plaintiff also states Captain Holly failed to properly train the jail staff with respect to medical emergencies. *Id.* at pg. 55.

### 2.  Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a summary judgment motion, the Court cannot weigh the evidence or resolve disputed issues of fact in favor of the moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"[A] disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact.  To be material, a fact must affect the outcome of the suit under the governing law."  Torgerson v. City of Rochester, 2011 WL 2135636, *16 (8th Cir. June 1, 2011)(internal quotation marks and citations omitted).

### 3.  Discussion

Defendants maintain they are entitled to judgment in their favor for the following reasons:  first, they have been sued in their official capacities only and there is no evidence of any unconstitutional Benton County policy or custom; second, they maintain there is no evidence of deliberate indifference on their part to Plaintiff's serious medical needs; third, they

AO72A
(Rev. 8/82)

argue Plaintiff was subjected to no unconstitutional conditions of confinement;  and finally they argue Plaintiff can offer no proof of any actual physical injury.  Each argument will be addressed in turn.

### A.  Individual versus Official Capacity Claims

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States.  In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution.  West v. Atkins, 487 U.S. 42, 48 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999).   The deprivation must be intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983.  Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities.  In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits.  As explained by the Gorman case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available.  *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991).  Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself.  *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991).  Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not

-8-

require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

*Id.* at 914.

The Eighth Circuit has advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability.  Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); see also Andrus v. Arkansas, 197 F.3d 953 (8th Cir. 1999).  When the plaintiff fails to state whether he is suing an official in his individual capacity, the Eighth Circuit has construed the claim to be against the official in his official capacity only.  See Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999).

In this case, Plaintiff is proceeding *pro se*.  While his complaint does not specify he is bringing both individual and official capacity claims, in response to the summary judgment motion, he indicates he is asserting claims against the Defendants in both capacities.  *Resp.* at ¶ 42(A).  Given that the distinction is difficult for even those with legal training to understand, see e.g., Vanhorn v. Oelschlager, 502 F.3d 775, 779 (8th Cir. 2007)(state officials misconstrued the differences between official and individual capacity claims and the immunities available), and Plaintiff's clarification in his summary judgment response, I believe the complaint should be construed as asserting both individual and official capacity claims.

## B.  Denial of Medical Care

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.  See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, plaintiff must

-9-

prove that defendants acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component: 'The [plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"   Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

Here, Plaintiff's claim is premised on the periods of delay in his receipt of treatment following the chemical being splashed in his eye.  He maintains he should have immediately had access to an eye wash station or been allowed to shower.  When in his cell, he indicates he attempted to get the chemical out of his eye using water, but his eye felt like it was burning. Resp. at ¶ 2(C).

The following morning he was given eye wash; however, Plaintiff points out he was not seen by Dr. Huskins until September 14th. Resp. at ¶4; Defts' Ex. 10 at pg. 4.  He was sent to the emergency room on September 15th.  Because of the delays in the provision of care, Plaintiff states he continues to have problems with his left eye and sustained permanent damage to his left eye.

I believe there are genuine issues of material fact as to whether Defendants' exhibited deliberate indifference to Plaintiff's serious medical needs.  First, the day the cleaning solution

AO72A
(Rev. 8/82)

splashed into his eye, Plaintiff's request to shower because of it was denied.  *Resp.* at ¶ 2(A).
He was given no eye wash solution and was not seen by medical personnel.  In fact, Plaintiff
received no assistance from jail personnel that day.  *Id.* at ¶ 2(D).  Second, the following day,
he was provided with eye wash but was not examined by medical personnel despite the fact
that Plaintiff's eye "was burning like fire."  *Id.* at ¶ ¶ 2(C) & 4.  Third, Plaintiff was not seen
by medical personnel until September 14th, two days after the incident. While Dr. Huskins
found no evidence of eye irritation or active inflammatory process, Dr. Clark, the emergency
room doctor, who saw the Plaintiff on September 15th, diagnosed Plaintiff with chemical
conjunctivitis.  Plaintiff continued to complain about pain in his eye, vision problems, and the
eye matting over.

Plaintiff objects to there being no emergency eye wash station in the jail, to the
twenty-four hour delay in the obtaining of prescription medications, and to not being provided
eye drops every two hours as prescribed.  Defendants treat this as a separate unconstitutional
conditions of confinement claim.  I believe it is part of his denial of medical care claim.  The
lack of such a station and the lack of training on procedures to be followed in the event of an
emergency are merely part of Plaintiff's denial of medical care claim.

With regard to the individual capacity claims against Sheriff Ferguson and Captain
Holly, there is nothing in the summary judgment record suggesting they knew about the
chemical having splashed into Plaintiff's eye or of his need for medical treatment because of
it.  Certainly there is nothing to suggest they were involved in any decisions regarding
Plaintiff's medical treatment.  Clemmons v. Armontrout, 477 F.3d 962, 967 (8th Cir. 2007)(to
establish personal liability of a supervisory defendant, plaintiff must show personal
involvement in, or direct responsibility for, deprivation of constitutional rights).

-11-

With respect to Nurse Smith and Sergeant Fry, it appears they first learned of the fact that a chemical had been splashed in Plaintiff's eye on September 13th.  *Resp.* at ¶ 39.  She spoke with Sergeant Fry over the phone and made the determination that Plaintiff was not in need of emergency medical care.  *Id.*  The record does not establish what Sergeant Fry said about Plaintiff's condition or what Nurse Smith based her decision on.  Based on the record, I conclude there are genuine issues of material fact that preclude summary judgment in Sergeant Fry's or Nurse Smith's favor.

With respect to Dr. Huskins, it appears he first became aware of the situation on September 14th when he examined the Plaintiff.  *Defts' Ex.* 10 at pg. 4.  Dr. Huskins found no evidence of an inflammatory process.  *Id.*  The following day, however, the emergency room doctor diagnosed Plaintiff as having chemical conjunctivitis.  *Defts' Ex.* 6 at pg.  Dr. Huskins continued to note no problems with Plaintiff's eye despite the findings of the emergency room doctor and the ophthalmologist.  I believe there are genuine issues of material fact as to whether Dr. Huskins exhibited deliberate indifference to Plaintiff' serious medical needs.  With respect to the official capacity claims, I believe Plaintiff has sufficiently alleged the existence of a custom or policy on the part of Benton County to deny or delay emergency medical treatment and to fail to offer immediate treatment when inmates come into contact with chemicals.

### 4.  Conclusion

For the reasons stated, I recommend that the summary judgment motion (Doc. 42) be granted in part and denied in part.  Specifically, I recommend that the motion be granted with respect to the individual capacity claims against Captain Robert Holly and Sheriff Ferguson.  In all other respects, the motion should be denied.

-12-

The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.

DATED this 29th day of August 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-13-