IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

CHESTER S. VAUGHN                                                                    PLAINTIFF

      v.                          Civil No. 09-5205

DR. JAMES HUSKINS,
Benton County Detention Center;
NURSE MARSHA SMITH,
Benton County Detention Center;
SGT. FRY, Benton County Detention
Center; CAPTAIN ROBERT HOLLY,
Benton County Detention Center;
and SHERIFF KEITH FERGUSON                                                      DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Chester Vaughn (Vaughn), filed this civil rights action pursuant to the provisions of 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis.*

The events that are the subject of this action occurred while Vaughn was incarcerated in the Benton County Detention Center (BCDC) from July 22, 2009, to November 8, 2009. Specifically, Vaughn claims his constitutional rights were violated when he was denied adequate medical care following a chemical splash to his left eye. Vaughn names as Defendants: Dr. John Huskins; Nurse Marsha Smith; Sergeant Fry; Captain Robert Holly; and Sheriff Keith Ferguson.

An evidentiary hearing was held on July 18, 2012. At the conclusion of the hearing, it was determined that the testimony of Dr. Todd Pierson, an optometrist Vaughn had seen, was necessary. A supplemental telephonic hearing was held on July 25, 2012, to obtain Dr. Pierson's testimony. The parties were also given time to brief the issue of qualified immunity.

-1-

Defendants filed their brief (Doc. 90) on July 27, 2012. Vaughn filed his brief on August 8, 2012 (Doc. 91). The case is now ready for decision.

### 1. Evidence Presented

The Court heard testimony from the following witnesses: (1) Vaughn, the Plaintiff; (2) Dr. Scott Woodward; (3) Jeffrey Blake; (4) Donald Chasten; (5) Allen Cravens; (6) Dr. John Huskins, a named Defendant; (7) Sergeant Walter Fry, a named Defendant; (8) Captain Robert Holly, a named Defendant; (9) Nurse Marsha Smith, a named Defendant; and (10) Dr. Todd Pierson. For purposes of discussion, the testimony of the witnesses will be summarized.

### Chester Samuel Vaughn

Vaughn testified he was in the BCDC from July to October of 2009. He was in convicted status.

On the evening of September 12th,[1] Vaughn testified he was mopping the floor of pod D-149. When he shoved the mop into the bucket, the chemicals and water splashed into his left eye. Because the trustees poured the chemical into the bucket, Vaughn did not know what type of chemical was being used, other than the fact it had a red label.

Vaughn pushed the emergency call button. He was initially told the guards were too busy. When the guards did respond, Vaughn asked if he could get into the shower to wash the chemical out of his eye. His request was refused.

Vaughn then ran to his cell and began splashing water into his face. He used a wet rag. When the guards came in to lock the doors down, Vaughn asked again if he could get in the

---

[1]Vaughn testified the injury to his eye occurred on September 12, 2009, a Friday night. September 12, 2009, was a Saturday.

shower to wash the chemical out of his eye. His request was refused. Vaughn testified he had a burning sensation in his eye and swelling around it.

Vaughn testified that he had difficulty sleeping that night. At morning pill call, Vaughn testified he ran up front and pounded on the door. When Deputy Kelley observed Vaughn's eye, he instructed Sergeant Fry to call Nurse Smith. Fry advised Vaughn that Nurse Smith said he would have to wait until sick call on Monday.

Vaughn submitted a medical request on September 13th. Joint Exhibit 3 at pg. 1. Vaughn testified that Deputy Lease brought him a bottle of eye wash that day.

Vaughn testified that he was seen by Dr. Huskins on Monday. Joint Exhibit 2 at pg. 7. Vaughn stated it was his belief that he should be seen by an eye doctor. In response, Dr. Huskins stated that this was not necessary. Vaughn indicated Dr. Huskins did not examine his eye. In fact, Vaughn testified Dr. Huskins stayed at least six or eight feet away from him. According to Vaughn, Dr. Huskins' favorite saying was: "I'll fix you right up." Dr. Huskins prescribed Tylenol and eye drops for five days.

In his opinion, jail staff had no compassion for him because he was a sex offender. Vaughn kept complaining and was taken to the emergency room on the morning of September 15th. He was seen by Dr. Clark and his eye was irrigated with saline solution. He was diagnosed with chemical conjunctivitis. Joint Exhibit 6 at pg. 1. Eye drops were prescribed to be taken 1 drop in both eyes, every two hours, for seven days. Id. Vaughn testified that he did not start getting his eye drops until two days after the prescription was turned in. Even when he did get the drops, he maintains it was not on the prescribed basis. Instead of receiving

the drops every two hours, he believed he received the drops four times a day and ran out on the fifth day.[2]

When his condition did not resolve itself, he was seen by Dr. Huskins, who arranged for him to be seen by Dr. Woodward at BoozmanHof Eye Clinic. Vaughn also continued to request information about the chemicals used and asked for something for the pain.

Vaughn testified that after he was seen by Dr. Woodward, he received the eye drops on a "pretty regular basis." However, Vaughn did not believe the drops were helping. He indicates he was still in pain and had problems with his vision. He indicated it was as if he was looking through a fogged up or smoked plexiglass.

Vaughn was seen by Dr. Woodward on three separate occasions. Vaughn testified that on the last visit, Dr. Woodward prescribed an eye drop, Zylet, that seemed to sooth his eye. However, when he was transferred to the ADC, he was not prescribed the same eye drops. Instead, he was prescribed Artificial Tears.

Vaughn was released from the ADC in December 2010. Since his release, he has been seen by Dr. Pierson at the Ozarks Family Vision Centre. Vaughn testified that he was advised that he had a "large" growth on his left eye and a "small" one on his right eye that could have been caused by chemicals.

According to Vaughn, a little chemical may have been splashed on the back of his right eye. He indicated his eyes feel sticky and he can feel the growth on his eye.

---

[2] He was prescribed Sulfacetamide (Bleph-10) 10% op drops. Joint Exhibit 6 at pg. 1. From September 18th to the morning of September 23rd, he received Ciprofloxacin three times a day. Joint Exhibit 8 at pg. 4. Both fight bacterial infections in the eye.

### Geoff Neal Blake

Blake testified that he was incarcerated at the BCDC from June to October or November of 2009. While he did not see any chemical splash into Vaughn's eye, Blake did see him the following morning at medication call. Blake testified that at that time Vaughn was in agony, trying to get some help from the guards, and his eye was extremely red and swollen. In fact, Blake testified you could not see the white of Vaughn's eye; it was completely blood shot.

When Deputy Lease took a look at Vaughn's eyes, he escorted Vaughn away and tried to get him some help. There were sinks in the cells with running water. For the first couple of days, Blake noticed Vaughn washing out his eye and getting Tylenol.

Although Blake could not recall the day he saw Vaughn at medication call, he believed it was during the weekend. Blake testified that on the weekends there were no medical personnel on call.

Blake testified that Vaughn's eye just did not seem to get better. In fact, Blake testified that Vaughn was in pain and became withdrawn.

### Donald Chasten

Chasten testified that he was incarcerated at the BCDC from June to October 2009. Chasten vaguely recalled the night Vaughn got chemicals in his eye. Chasten did not witness the chemicals getting splashed into Vaughn's eye. However, Chasten, who was cell mates with Vaughn, could recall him washing his eyes out.

There was an emergency button on an intercom in the pod that could be pushed if help was needed. The following morning, Chasten saw Vaughn beating on the pod room door to

AO72A
(Rev. 8/82)

get attention. Vaughn's eye was red and was partially closed as if he was having trouble seeing out of it. The eye was really red and sore looking for several days. Chasten wondered why Vaughn did not have a patch over it.

### Alan Cravens

Cravens testified that he was incarcerated in the BCDC from May of 2009 until February of 2010. He believed he was on the top tier of the pod when Vaughn got chemicals in his eye while mopping. Vaughn pushed the emergency button located at the front door of the pod. Cravens testified Vaughn was persistent because his eye was hurting and burning. Cravens observed Vaughn go out the pod door to talk to a guard. Cravens saw Vaughn at a sink trying to wash his eye out.

The following morning, Cravens was standing in the pill line when he noticed Vaughn's eye was beet red; he could not see out of it; and he was in pain. Cravens recalled that it took Vaughn a while to get treatment.

### Dr. John Huskins

Dr. Huskins was the jail doctor for the BCDC for a period of five years ending in February 2012. Dr. Huskins testified he examined Vaughn's eye on September 14th, using a magnifier with a light. Dr. Huskins was looking for any cloudiness or opacification of the eye. He observed the cornea was clear but there was some irritation. He did not see any filaments but probably would not have seen them with the magnifier. Dr. Huskins could not determine what caused the irritation and did not know that Vaughn had been given eye wash. He diagnosed Vaughn as having conjunctivitis, a condition where the white part of the eye is red and the area is swollen.

Dr. Huskins started Vaughn on natural tears eye drops for lubrication for a period of five days. Dr. Huskins testified that he believed the eye drops were sufficient.

According to his notes, the chemical got into Vaughn's eye on Saturday night, September 12th. Dr. Huskins did not see Vaughn until Monday, September 14th, so he indicated flushing the eye at that time would not have been helpful or beneficial.

Dr. Huskins indicated that one of his favorite sayings is: "I will fix you right up." He may very well have said that to Vaughn.

When Vaughn still complained of pain the following day, Dr. Huskins sent him to the hospital. Joint Exhibit 6. Dr. Clark diagnosed chemical conjunctivitis and prescribed Sulfacetamide drops every two hours. Dr. Huskins changed the eye drop prescription to a similar antibiotic eye drop, Ciprofloxacin, four times a day because of Vaughn's allergies. Dr. Huskins testified that four times a day is sufficient for an antibiotic eye drop. In his opinion, having the drops every two hours would not have been helpful to Vaughn.

Dr. Huskins next saw Vaughn on September 21st for a cold, at which time Vaughn also indicated that his eye was still bothering him. Dr. Huskins made a note that an appointment should be scheduled for Vaughn at BoozmanHof. Joint Exhibit 2 at pg. 7.

On September 30th, when Dr. Huskins saw Vaughn, Vaughn did not mention his eye. By October 4th, Dr. Huskins indicated Vaughn had been seen by Dr. Woodward and was prescribed no pain medication. On October 7th, Vaughn was started on Naproxen Sodium, an anti-inflammatory. Dr. Huskins testified that during late September and October, he prescribed Vaughn pain relieving medication, such as Tylenol, several times.

On October 9th, Dr. Huskins examined Vaughn's eye and did not see any problems. He did note that Vaughn had nystagmus and pterygium.[3] Pterygium is a chronic irritation and can grow out and affect the vision. It takes several years of chronic irritation from wind, sun, dust, among other things, to cause this problem.

On October 12th, Dr. Huskins rechecked Vaughn's eyes. While Dr. Huskins did not see any problems, he sent Vaughn to BoozmanHof for evaluation. In fact, Dr. Huskins testified he saw no evidence of long term damage to Vaughn's eye or cornea.

### Dr. Scott Woodward

Dr. Woodward is an optometrist who examined Vaughn on September 23rd, September 30th, and October 14th. On the initial visit, Vaughn reported being in pain, feeling like he had a foreign body in his left eye, and difficulty seeing. Dr. Woodward diagnosed Vaughn as having inflammatory keratitis, which is an inflammation of the cornea, and as having small filaments on the internal cornea. See also Joint Exhibit 7.

According to Dr. Woodward, inflammation can be caused from dry eyes, allergies, or chemicals. Dr. Woodward testified there are some conditions that you know are caused by chemicals. For example, he testified that the eye may be opaque and have large abrasions. With Vaughn, Dr. Woodward testified that he did not see what he would expect to see if there had been chemical in the eye; however, he could not exclude chemicals as a possible cause of the inflammation. He prescribed eye drops.

---

[3] Nystagmus is a term used to describe "fast, uncontrollable movements of the eye." http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm (accessed August 21, 2012). "A pterygium is a non-cancerous growth of the clear tissue (conjunctiva) that lays over the white part of the eye (sclera)." http://www.nlm.nih.gov/medlineplus/ency/article/001011.htm (accessed August 21, 2012).

AO72A
(Rev. 8/82)

Dr. Woodward had seen Vaughn on prior occasions and testified that Vaughn had congenital nystagmus. Dr. Woodward testified that this condition limits Vaughn's vision. Additionally, in prior visits to BoozmanHof, as far back as 1997, it was noted that Vaughn had Pterygium. Joint Exhibit 7 at pg. 19.

On September 23rd, based on what Dr. Woodward saw, he did not believe there should be a lot of pain. He did see filaments on the surface of the eye; however, he testified the filaments would not affect vision. In Dr. Woodward's opinion, there was nothing to indicate Vaughn would have continued problems with his vision as a result of the chemicals splashing into his eye. Dr. Woodward prescribed Artificial Tears and an antibiotic eye drop.

According to Dr. Woodward, when a chemical comes in contact with an eye, the first thing that should be done is flush it out with saline. If saline is not available, water is the next option. Dr. Woodward could not tell from the material safety data sheets (MSDS) for the chemicals, PSQ Disinfectant Cleaner and DMQ Damp Mop Neutral Disinfectant Cleaner, whether water would have flushed it out. Joint Exhibit 12.

Dr. Woodward next saw Vaughn on September 30th. Dr. Woodward noted the filaments were not present and there was no defect on the surface of Vaughn's eye, although there was some redness. Dr. Woodward did notice some small bumps on the surface of the eye caused by allergies. Dr. Woodward put Vaughn on a steroid drop to hopefully eliminate the pain and inflamation.    On October 14th, Dr. Woodward saw Vaughn again. Dr. Woodward noted some rough spots on the surface of the eye. Dr. Woodward prescribed Zylet, a combination antibiotic and steroid. He also prescribed Ibuprofen for pain and discomfort

and Artificial Tears. Dr. Woodward testified that he saw nothing during Vaughn's office visits that indicated an injury to his eye had affected his left eye.

### Sergeant Walter Fry

Sergeant Fry testified that he was day shift sergeant in September of 2009. Sergeant Fry testified that the morning following the chemical splash, Sergeant Fry testified he was notified to come down to the pod because an inmate had chemical in his eye. He looked at Vaughn's eye and gave the order for someone to get the eye wash. Sergeant Fry testified he was present when the eye wash was being administered. He asked Vaughn if the eye wash was helping. Vaughn stated that the eye wash was relieving some of the pain. The eye wash bottle was left out all day. From pod control, Sergeant Fry observed Vaughn using the bottle a few more times that day.

Sergeant Fry called Nurse Smith and advised her of the situation including the fact that Vaughn's pain had been relieved somewhat by the eye wash. Nurse Smith advised Sergeant Fry to call her back if Vaughn's condition worsened. Sergeant Fry testified he advised the deputies to come and get him if Vaughn's condition worsened. According to Sergeant Fry, he never heard that Vaughn had gotten worse.

Sergeant Fry recalled Vaughn asking to see the medical staff but indicated this occurred before the nurse was contacted. When he first saw Vaughn, Sergeant Fry did not know the incident had occurred the prior night.

Vaughn submitted a medical request form on September 13th. The form was picked up by Deputy Acosta. Vaughn stated that he had gotten cleaning chemicals in his left eye and it felt like it was on fire. Joint Exhibit 3 at pg. 1. In Sergeant Fry's opinion, this should have

-10-

been treated as an emergency request for medical care and Deputy Acosta should have notified his shift supervisor.

### Captain Robert Holly

Captain Holly testified that he was the jail captain at the BCDC until November of 2011. He received Vaughn's requests for the MSDS. Initially, he was willing to provide Vaughn with the MSDS but did not know what chemical was being used, and, therefore, responded to Vaughn's request, "We have several, do you know which one? I have no issue with." Joint Exhibit 4 at pg. 2. After reflection, Captain Holly concluded he did not want the list of chemicals to be in the pod for safety reasons. He therefore denied Vaughn's request for that information, but would have provided it to the medical personnel if they requested it.

Captain Holly testified he knew Vaughn was being medically treated. Captain Holly was satisfied with the medical treatment. None of the medical care providers asked for the chemical sheet. While he could not recall any other incidents regarding chemicals splashing into someone's eye, he did recall an inmate drinking chemicals.

### Nurse Marsha Smith

Nurse Smith testified that she worked at the BCDC in September of 2009. She received a call from Sergeant Fry after Vaughn had been provided with eye wash. She stated that if Vaughn was better, his name should be put on the list to see the doctor.

Nurse Smith indicated she did not normally go to the jail on her days off. With respect to the scheduling of the medical staff, she testified command staff did that. If a serious problem comes up when no medical staff is working, the inmate is sent to the hospital. In

Vaughn's case, she believed he was feeling better and instructed Sergeant Fry to call her back if Vaughn got worse.

### Dr. Todd Pierson

Dr. Pierson testified that he examined Vaughn on November 10, 2011. Plaintiff's Exhibit 1. In Dr. Pierson's opinion, the main source of Vaughn's reduced vision is his nystagmus. Vaughn's uncorrected vision is 20/800 in both eyes.

However, Dr. Pierson observed pterygium in both eyes with the left eye being considerably worse. This is a chronically growing condition and occurs with chronic exposure to dirty dry conditions or ultra violet light and any agent could aggravate it.

In general, "[r]isk factors are exposure to sunny, dusty, sandy, or windblown areas." http://www.nlm.nih.gov/medlineplus/ency/article/001011.htm (accessed August 21, 2012). Some people are predisposed to have this condition. Typically, the pterygium would be balanced in the eyes. In approximately twenty percent of patients the pterygium is worse in one eye. Treatment initially consists of lubrication and wearing sunglasses. When the pterygium are getting large enough to cause vision problems, the pterygium are surgically removed.

When he examined Vaughn, Dr. Pierson noted that the pterygium was possibly worse secondary to chemical burn. He made the notation because it might have explained the difference in sizes; however, he testified he could not say this with any degree of medical certainty.

Dr. Pierson had not seen the BoozmanHof records. Filaments can be scraped off and followed up with a anti-inflammatory and antibiotic combination.

If Vaughn had pterygium in his eyes before 2009, the chemical did not cause it. If the chemical did have any affect, a significant change to the pterygium should have occurred within a relatively short period of time--ten days to a couple of weeks. The pterygium would be inflamed, swollen, and red. The inflammation would require a steroid drop.

In Dr. Pierson's opinion, chemical being in an eye constitutes an emergency. The eye should be irrigated with copious amounts of water or sterile saline solution within five to ten minutes. Depending on the amount and strength of the chemical, Dr. Pierson testified that simply splashing water into the eye from a sink would typically not be enough. The individual should be examined for inflammation of the cornea. Severe chemical burns would cause the cornea to have cloudy or opaque areas.

### 2. Discussion

The Defendants who are being sued in their individual capacities, Dr. Huskins, Nurse Smith, Sergeant Fry, and Captain Holly first argue they are entitled to qualified immunity.[4] "Qualified immunity shields government officials from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Brown v. City of Golden Valley, 574 F.3d 491, 495 (8th Cir. 2009).

The qualified immunity inquiry consists of two questions: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Johnson v. Carroll, 658 F.3d 819, 825 (8th Cir. 2011). "Unless the answer to both of these

---

[4] The individual capacity claims against Sheriff Ferguson were dismissed. Doc. 54.

questions is yes, the defendants are entitled to qualified immunity." Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010).

"Where a prisoner needs medical treatment prison officials are under a constitutional duty to see that it is furnished." Crooks v.Nix, 872 F.2d 800, 804 (8th Cir. 1989). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment's ban against cruel and unusual punishments." Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir. 2009)(citing Farmer v. Brennan, 511 U.S. 825, 828 (1994)).  To prevail on an Eighth Amendment claim, Plaintiff must prove that Defendants acted with deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

We start with the proposition that cleaning solution splashed into an inmate's eye constitutes a serious medical condition.  The question then becomes whether Defendants knew of the serious medical need and were deliberately indifferent to it.

With respect to Dr. Huskins, the evidence establishes he first learned that chemicals had splashed into Vaughn's eye on Monday, September 14th.  He saw Vaughn that day, noted he had conjunctivitis and prescribed eye drops.  The following day, when Vaughn continued to complain of pain, Dr. Huskins directed BCDC officials to take Vaughn to the hospital.  He was treated by Dr. Clark and prescribed an antibiotic eye drop.  While Dr. Huskins did order

AO72A
(Rev. 8/82)

a different antibiotic eye drop and directed it dispensed at different times, this was done out of concern for Vaughn's various allergies. When Vaughn continued to complain, Dr. Huskins directed that he be taken to an optometrist. Vaughn was seen by Dr. Woodward on three separate occasions. He received the medication prescribed by Dr. Woodward and Dr. Huskins also ordered pain relieving medication. It is undisputed that Vaughn had two eye conditions that existed prior to the chemicals getting in his eye, nystagmus and pterygium. There was no medical testimony presented suggesting that these conditions were caused by the chemical solution or aggravated by it. In fact, Dr. Pierson testified that he could not say with any degree of medical certainty that the chemical caused the pterygium to worsen. The evidence clearly does not support a finding that Dr. Huskins was deliberately indifferent to Vaughn's serious medical needs. Dr. Huskins is therefore entitled to qualified immunity.

With respect to Nurse Smith, the evidence is clear that she was contacted by Sergeant Fry and told Vaughn had been given eye wash and that this relieved the pain and discomfort in his eye. Nurse Smith instructed Sergeant Fry to call her back if Vaughn's condition worsened and to place Vaughn on the sick call list for Monday. Nurse Smith received no further calls regarding Vaughn that weekend. On Monday, Vaughn was seen by medical staff and treated. The evidence does not support a finding that Nurse Smith was deliberately indifferent to Vaughn's serious medical needs. She is therefore entitled to qualified immunity.

Similarly, with respect to Sergeant Fry, he did not learn of the chemical splashing into Vaughn's eye until the next day. When he was advised of the situation, he spoke to Vaughn, ordered the eye wash to be given to him, and called the nurse for further directions. He also communicated to jail staff that if Vaughn's condition worsened, command staff was to be

-15-

advised and the nurse contacted. The evidence does not support a finding of deliberate indifference to Vaughn's serious medical needs. He is entitled to qualified immunity.

With respect to Captain Holly, his actions that are at issue are his failure to provide Vaughn with the MSDS for the chemicals being used to mop the floor. Captain Holly was aware that Vaughn was receiving medical care. There is no suggestion that any of the medical personnel who saw Vaughn asked for the MSDS or that Vaughn would have been treated differently had the MSDS been made available. There is simply no evidence to support a finding of deliberate indifference on Captain Holly's part. He therefore is entitled to qualified immunity.

Finally, Vaughn has brought an official capacity claim against Sheriff Ferguson and the other Defendants. "A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity." Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010). In other words, the official capacity claims are treated as claims against Benton County itself. See Murray v. Lene, 595 F.3d 868, 873 (8th Cir. 2010).

To establish Benton County's liability under § 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." Moyle v. Anderson, 571 F.3d 814, 817 (8th Cir. 2009)(citation omitted). The applicable law has been summarized as follows:

> There are two basic circumstances under which municipal liability will attach: (1) where a particular municipal policy or custom itself violates federal law, or directs an employee to do so; and (2) where a facially lawful municipal policy or custom was adopted with "deliberate indifference" to its known or obvious consequences. Seymour v. City of Des Moines, 519 F.3d 790, 800 (8th

> Cir.2008). There need not be a finding that a municipal employee is liable in his or her individual capacity before municipal liability can attach. Speer v. City of Wynne, 276 F.3d 980 (8th Cir.2002); Parrish v. Luckie, 963 F.2d 201, 207 (8th Cir.1992) ("A public entity or supervisory official may be held liable under § 1983 even though no government individuals were personally liable."). Where an official policy is itself unconstitutional or directs employees to take unconstitutional action, no evidence beyond a statement of the policy and its exercise is necessary to establish § 1983 liability. Szabla v. City of Brooklyn Park, 486 F.3d 385, 389-90 (8th Cir.2007).

Id. at 817-18.

Vaughn maintains Benton County had a policy of failing to promptly provide inmates with adequate medical care. "To establish the existence of a policy, [Vaughn] must point to a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." Jenkins v. County of Hennepin, 557 F.3d 628, 633 (8th Cir. 2009). He "must also show that the policy was unconstitutional and that it was the moving force behind the harm that he suffered." Id. (internal quotation marks and citation omitted).

Vaughn has made no such showing. "Under the Constitution, . . . the range of acceptable medical care is broad. ... The Constitution does not require jailers to handle every medical complaint as quickly as each inmate might wish." Id. (citations omitted). Although Vaughn has shown that communication and the delivery of medical care "could be improved, he cannot establish that any of its official policies reflect deliberate indifference to serious medical needs." Id. at pg. 633-34. In fact, the testimony established that medical personnel could be contacted on weekends, or whenever no medical staff was present, regarding an inmate's medical issues. If emergency medical care was needed, the medical staff and command staff could authorize the transport of the inmate to the hospital.

### 3. Conclusion

For the reasons stated, I recommend that judgment be entered in favor of Defendants and this action be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 22nd day of August 2012.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE